TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-99-00329-CV







Texas Ratepayers
' Organization to Save Energy, Inc. and Texas Legal


Services Center, Appellants



v.



Texas Utilities Electric Company, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. 97-14029, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING







 Appellants Texas Ratepayers' Organization to Save Energy, Inc. ("Texas ROSE")
and Texas Legal Services Center ("TLSC") sued Texas Utilities Electric Company ("TU
Electric") pursuant to the Public Utility Regulatory Policies Act (1) ("PURPA") to recover attorneys'
fees and litigation costs incurred by appellants in a hearing before the Public Utility Commission
of Texas ("PUC"). Appellants and TU Electric both filed motions for summary judgment. The
district court denied appellants' motion for summary judgment and granted summary judgment
in favor of TU Electric. We affirm the district court judgment.


BACKGROUND

 The Texas Legislature created the PUC in 1975 with the enactment of the Public
Utility Regulatory Act ("PURA"). (2) The legislature vested the PUC with the authority to fix and
regulate rates of electric utilities and to adopt rules for determining the classification of customers
and services and the applicability of rates. See PURA § 36.001. The PUC thus has authority to
establish rates charged to customers for the sale of electricity. See id.; Public Util. Comm'n v.
GTE-Southwest, Inc., 901 S.W.2d 401, 407 (Tex. 1995). 

 Texas ROSE and TLSC are non-profit corporations organized under the laws of
the State of Texas. Texas ROSE promotes energy conservation on behalf of residential, low-income, and small commercial energy consumers. TLSC provides legal assistance to low-income
Texans. TU Electric is a Texas corporation engaged in the generation, purchase, transmission,
distribution, and sale of electricity in eighty-seven counties throughout Texas. 

 On January 22, 1993, TU Electric filed an application with the PUC for a 15.3%
utility service rate increase, which would result in an increase in annual revenues for TU Electric
of $748,275,438 based on a test-year ending June 30, 1992. PUC rules require that when a utility
requests a major rate change, (3) it must file its most recent energy efficiency plan. See 16 Tex.
Admin. Code § 23.22(c) (1999). PUC rules also require a utility to provide testimony that
specifically indicates the extent to which energy efficiency goals have been reached as of the date
of filing. See id. Accordingly, TU Electric included with its application an energy efficiency plan
and corresponding testimony. TU Electric also complied with PURA's requirement that an
electric utility requesting a major rate change publish notice to the public of the proposed change
once each week for four successive weeks before the effective date of the proposed change. See
PURA § 36.103. TU Electric's application was designated by the PUC as Docket No. 11735,
Application of Texas Utilities Electric Company for Authority to Change Rates. See id. § 36.105
(mandating that PUC hold a hearing in every case in which the proposed rate change constitutes
a major change).

 On February 23, 1993, Texas ROSE filed a motion to intervene in Docket No.
11735 on behalf of four residential ratepayers of TU Electric, "as well as other ratepayers." The
motion states that Texas ROSE and the ratepayers it represents have a direct interest in the
outcome of the docket with regard to various issues related to energy efficiency and conservation. (4) 
On March 5, 1993, TLSC filed its motion to intervene in Docket No. 11735 on behalf of five low-income ratepayers of TU Electric. (5) 

 The administrative law judge ("ALJ") presiding over the docket allowed both
appellants to intervene. The hearing on the merits convened on May 3, 1993 and adjourned on
September 21, 1993. During the course of the hearing, Texas ROSE and TLCS offered expert
testimony critical of TU Electric's proposed rate increase. In particular, appellants' witnesses
alleged that the amount of the proposed rate increase was excessive because TU Electric's
demand-side management expenses were not reasonable, and that TU Electric's cost-of-service
and rate design methodology were not consistent with least-cost planning or integrated resource
planning. At the conclusion of the hearing, the ALJ and two hearings examiners issued a 341-page proposal for decision ("PFD") (6) in which they recommended a 10.66% rate increase, which
would result in a total revenue increase of $530,664,109. On May 27, 1994, the PUC issued its
appealable second order on rehearing in which it adopted the PFD with several modifications and
approved a total revenue increase of $454.5 million.

 Following the issuance of PUC's second order on rehearing, on December 22, 1997
appellants filed suit in Travis County district court for reimbursement of attorneys' fees and other
litigation costs incurred while participating in Docket No. 11735. (7) Appellants contended in their
motion for summary judgment that PURPA section 2632 authorized reimbursement of such
expenses for an intervenor advocating consumer interests in a proceeding involving PURPA
standards. TU Electric argued in its motion for summary judgment that the reimbursement
sought by appellants was not authorized by PURPA because: (1) PURPA reimbursement applies
only to "electric consumers," and neither Texas ROSE nor TLSC intervened in Docket No. 11735
as an "electric consumer" of TU Electric; (2) Docket No. 11735 was not a proceeding at which
the PUC had considered the adoption of any PURPA standards; and (3) adequately funded
alternative means of consumer representation were available. The district court granted summary
judgment in favor of TU Electric without specifying the ground relied upon.

DISCUSSION

 When both parties move for summary judgment and the trial court grants one
motion and denies the other, the reviewing court should review the summary judgment evidence
presented by both sides and determine all questions presented. See Bradley v. State, 990 S.W.2d
245, 247 (Tex. 1999) (citing Commissioners Court v. Agan, 940 S.W.2d 77, 81 (Tex. 1997));
Jones v. Strauss, 745 S.W.2d 898, 900 (Tex. 1988). The reviewing court should render the
judgment that the trial court should have rendered. See Agan, 940 S.W.2d at 81; Members Mut.
Ins. Co. v. Hermann Hosp., 664 S.W.2d 325, 328 (Tex. 1984). 

 Summary judgment is proper only if the summary judgment proof establishes that
there are no genuine issues of material fact and that the movant is entitled to judgment as a matter
of law. See City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 675-79 (Tex. 1979). 
On appeal from a summary judgment, we take the evidence favorable to the non-movant as true
and indulge every reasonable inference in favor of the non-movant. See Nixon v. Mr. Property
Management Co., 690 S.W.2d 546, 548-49 (Tex. 1985). 

 Appellants base their reimbursement claim on PURPA, a federal law passed by
Congress in 1978 to encourage the conservation of energy supplied by electric utilities, the
optimization of the efficiency of the use of facilities and resources by electric utilities, and
equitable rates to electric consumers. See PURPA § 2611 (West 1985). PURPA set forth certain
ratemaking and utility service standards designed to further these purposes. See id. §§ 2621(d),
2623(b). 

 PURPA section 2621(d) established ratemaking standards in the following areas: 
cost of service, declining block rates, time-of-day rates, seasonal rates, interruptible rates, and
load management techniques. See id. § 2621(d)(1)-(6). (8) Section 2623(b) established five
additional federal standards concerning master metering, automatic adjustment clauses,
information to consumers, procedures for termination of electric service, and advertising. See id.
§ 2623(b)(1)-(5). Congress did not impose these standards upon local utilities; rather, it required
that each state regulatory authority hold public hearings to consider and determine whether the
federal standards were appropriate under the conditions and circumstances facing state utilities and
consumers. See id. §§ 2621(a), 2623(a). The state regulatory bodies were authorized to
undertake the consideration and make the determination whether to adopt or reject PURPA
standards "in any proceeding respecting the rates of the electric utility." Id. § 2622(a). 

 Congress established various procedural requirements for the state hearings at
which the implementation of PURPA standards would be considered. See id. §§ 2621(b),
2623(a). Among the requirements was that the consideration be made after public notice and a
hearing and that the determination of whether to implement the standards be in writing, based
upon findings included in such determination, and available to the public. See id. PURPA
required that the hearings concerning the eleven original standards begin not later than two years
after November 9, 1978, the date of PURPA's enactment, and conclude with a decision to adopt
or reject the standards not later than two or three years after the same date, depending on which
set of standards was being considered. See id. § 2622(b) (determination concerning
implementation of six standards set forth in section 2621(d) to be completed not later than three
years after November 9, 1978), § 2623(a) (determination concerning implementation of five
standards set forth in section 2623(b) to be completed not later than two years after November 9,
1978). 

 PURPA also required each state regulatory authority to begin its consideration of
the 1992 standards adopted by paragraphs (7)-(9) of section 2621(d) not later than two years after
October 24, 1992, and complete its consideration of them not later than three years after that date. 
See id. § 2622(b)(1) (West Supp. 1999). Furthermore, each state regulatory authority was to
consider and make a determination concerning the implementation of section 2621(d)(10) not later
than one year after October 24, 1992. See id. § 2621(10)(C). 

 PURPA also created a federal right of participation for consumers of electric
utilities in the state regulatory authority hearings. See id. §§ 2631, 2632 (West 1985). The
consumer participation provisions included the right to intervene, access to information, and
compensation for costs of participation. See id. Any participant or intervenor was authorized by
PURPA to request and obtain a consideration and determination of whether PURPA standards
would be adopted by a state regulatory body in any ratemaking proceeding. See id. § 2622(a). 
Provided that no alternative means of representation was available, section 2632 provided that an
electric consumer who substantially contributed to the approval, in whole or in part, of a position
"relating to any standard set forth in subchapter II of this chapter," was to be reimbursed by the
electric utility for reasonable attorneys' fees and other costs incurred in the preparation and
advocacy of such position. (9) See id. § 2632(a). Where a state provided an "alternative means for
assuring representation of electric consumers," see id., however, PURPA waived the requirement
for compensation for the costs of intervention. See id. § 2632(b). 

 Appellants contend that PURPA section 2632(a) authorizes reimbursement for the
costs of participating in any proceeding at which any of the issues addressed by the PURPA
standards are considered. Appellants argue that because their participation in PUC Docket No.
11735 was related to two PURPA standards--integrated resource planning (10) and investments in
conservation and demand management--TU Electric must compensate them for their attorneys' fees
and other litigation costs. TU Electric argues for a less expansive interpretation of section
2632(a). TU Electric contends that reimbursement is limited to the costs of participating in
proceedings at which a determination is made as to the appropriateness of a state's implementation
of the standards adopted by PURPA sections 2621(d) and 2623(b). 

 Statutory construction is a question of law. See Johnson v. City of Fort Worth, 774
S.W.2d 653, 656 (Tex. 1989). The resolution of an issue of statutory construction must begin
with an analysis of the statute. See Cail v. Service Motors, Inc., 660 S.W.2d 814, 815 (Tex.
1983). Our objective when we construe a statute is to determine and give effect to the
legislature's intent. See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc., 966 S.W.2d 482,
484 (Tex. 1998); Union Bankers Ins. Co. v. Shelton, 889 S.W.2d 278, 280 (Tex. 1994). 

 The legislature's intent is determined from the plain and common meaning of the
words used. See id. (citing Monsanto Co. v. Cornerstones Mun. Util. Dist., 865 S.W.2d 937,
939 (Tex. 1993)). In determining legislative intent with respect to a specific provision, a court
must look to the entire act and give effect to every part. See Jones v. Fowler, 969 S.W.2d 429,
432 (Tex. 1998); Taylor v. Firemen's and Policemen's Civil Serv. Comm'n, 616 S.W.2d 187, 190
(Tex. 1981). Consideration should be given to the nature and object of the act as a whole, as well
as the consequences that would follow from each construction. See Sayre v. Mullins, 681 S.W.2d
25, 27 (Tex. 1981).

 The express purpose of PURPA is to promote the broad goals of energy
conservation and efficiency while encouraging equitable rates. See PURPA § 2611 (West 1985). 
Congress required states to consider implementing federal ratemaking standards that were drafted
to further these goals. While PURPA did not limit the type of proceeding at which the
determination to implement the federal standards could be made, the statute did establish
procedural requirements for the state proceedings and mandate that the proceedings be held within
a specified time period. Electric utilities were liable to reimburse a consumer for litigation
expenses incurred in any proceeding relating to the consideration of PURPA standards.

 Congress intended PURPA to be a mechanism by which states could further the
federal goals of energy efficiency, conservation, and equitable rates through the implementation
of specific ratemaking standards. The reimbursement provision of section 2632(a) refers
specifically to the fifteen ratemaking standards established by PURPA sections 2621(d) and
2623(b). These standards encompass a wide range of ratemaking issues. Almost any rate
proceeding, no matter how limited, involves a consideration of one or more of the issues. 
Construing section 2632(a) in the manner suggested by appellants would therefore create a general
right of reimbursement for costs incurred in all state ratemaking proceedings.

 Having considered PURPA as a whole, we conclude that appellants' interpretation
of section 2632(a) is unduly expansive. We construe section 2632(a) to limit consumers to
reimbursement for the costs of participating in state proceedings held to consider the
implementation of the federal standards. Therefore, in order for TU Electric to be liable to
compensate appellants for attorneys' fees and other costs incurred in Docket No. 11735, the
record must demonstrate that the hearing involved the PUC's consideration and determination of
the appropriateness of implementation of PURPA standards. (11)

 Docket No. 11735 exhibits none of the indices of a state hearing held to consider
the implementation of PURPA ratemaking standards. The hearing was initiated by TU Electric
requesting a rate increase pursuant to state law. The PUC did not publish notice of its intent to
consider the implementation of PURPA standards at the hearing. No party requested that the
hearing be designated a PURPA proceeding or that the PUC consider the appropriateness of
implementing PURPA standards at the hearing. While appellants' experts did testify extensively
concerning integrated resource planning and demand-side management, both of which are
ratemaking standards adopted by the 1992 amendment to PURPA, see id. § 2621(d)(8), (9), there
is nothing in the record to suggest that the hearing's purpose was to consider the adoption of these
standards. At the hearing's conclusion, no request to implement any PURPA standards was made,
nor was PURPA referred to in either the PFD or the PUC's final order.

 In sum, nothing in the record suggests that Docket No. 11735 was held to
determine anything other than the state regulatory question of whether TU Electric should be
allowed to raise its rates. Because the PUC did not consider the adoption or implementation of
PURPA standards during Docket No. 11735, appellants are not eligible to receive reimbursement
pursuant to PURPA for costs incurred at the hearing. Having so concluded, we need not consider
the other issues raised by the parties. The judgment of the trial court is affirmed.



 

 Jan P. Patterson, Justice

Before Justices Jones, Kidd and Patterson

Affirmed

Filed: January 27, 2000

Do Not Publish
1. 16 U.S.C.A. §§ 2601-2645 (West 1985 & Supp. 1999).
2. Public Utility Regulatory Act, 64th Leg., R.S., ch. 721, §§ 1-92, 1975 Tex. Gen. Laws
2327-52 (Tex. Civ. Stat. Ann. art. 1446c, since repealed by Public Utility Regulatory Act of
1995, 74th Leg., R.S., ch. 9, §§ 1-3, 1995 Tex. Gen. Laws 31-88, codified at Tex. Util. Code
Ann. §§ 11-63 (West 1998)). We will cite to the current version for convenience. 
3. See PURA § 36.101 (defining "major change" as "an increase in rates that would
increase the aggregate revenues of the applicant more than the greater of $100,000 or 2 percent").
4. Specifically, Texas ROSE asked to intervene to address the following issues: (1) the
costs, benefits, and efficiency of TU Electric's demand-side management programs; (2) the
incentive rate of return sought by TU Electric with regard to its demand-side management
program as well as other incentives sought by TU Electric for energy conservation; (3) the
reasonableness of costs and expenditures of TU Electric's demand-side management program; (4)
the effect of TU Electric's capacity, demand, and resource planning on the promotion of energy
conservation; (5) the effect of supply-side energy decisions or choices made by TU Electric on
the promotion of energy conservation and whether such choices or decisions were consistent with
least-cost planning; and (6) the reasonableness and necessity of costs sought to be recovered by
TU Electric from its ratepayers in pursuit of additional supply-side energy choices.
5. In its motion to intervene, TLSC expressed its desire to address two issues: (1) the cost
effectiveness of TU Electric's demand-side management programs and (2) the availability of
utility-financed conservation for low-income households.
6. The PFD included 230 findings of fact and 45 conclusions of law.
7. Appellants alleged that Texas ROSE had incurred attorneys' fees and expert witness fees
of approximately $200,000, and that TLSC had expended legal time valued at $50,000 and had
incurred expert witness fees of approximately $29,000.
8. In 1992, section 2621 of PURPA was amended to add four new ratemaking standards. 
See 16 U.S.C.A. § 2621(d)(7)-(10) (West Supp. 1999) ("1992 standards
"). These standards
address integrated resource planning, investments in conservation and demand management,
energy efficiency investments in power generation and supply, the effects of wholesale power
purchases on utility cost of capital, the effects of leveraged capital structures on the reliability of
wholesale power sellers, and assurance of adequate fuel supplies. See id.
9. Subchapter II of Chapter 46--Public Utility Regulatory Policies, entitled "Standards for
Electric Utilities," is comprised of PURPA sections 2621 through 2627. Section 2621(d) and
2623(b) are the only sections therein that establish ratemaking standards.
10. See PURPA § 2602(19) (West Supp. 1999) ("The term 'integrated resource planning'
means, in the case of an electric utility, a planning and selection process for new energy resources
that evaluates the full range of alternatives, including new generating capacity, power purchases,
energy conservation and efficiency, cogeneration and district heating and cooling applications, and
renewable energy resources, in order to provide adequate and reliable service to its electric
customers at the lowest system cost.").
11. Because of the conclusion reached herein, we need not analyze how time limits imposed
by PURPA for the consideration of PURPA standards impact the issue of reimbursement
eligibility.



BR WP="BR1">

 

 Jan P. Patterson, Justice

Before Justices Jones, Kidd and Patterson

Affirmed

Filed: January 27, 2000

Do Not Publish
1. 16 U.S.C.A. §§ 2601-2645 (West 1985 & Supp. 1999).
2. Public Utility Regulatory Act, 64th Leg., R.S., ch. 721, §§ 1-92, 1975 Tex. Gen. Laws
2327-52 (Tex. Civ. Stat. Ann. art. 1446c, since repealed by Public Utility Regulatory Act of
1995, 74th Leg., R.S., ch. 9, §§ 1-3, 1995 Tex. Gen. Laws 31-88, codified at Tex. Util. Code
Ann. §§ 11-63 (West 1998)). We will cite to the current version for convenience. 
3. See PURA § 36.101 (defining "major change" as "an increase in rates that would
increase the aggregate revenues of the applicant more than the greater of $100,000 or 2 percent").
4. Specifically, Texas ROSE asked to intervene to address the following issues: (1) the
costs, benefits, and efficiency of TU Electric's demand-side management programs; (2) the
incentive rate of return sought by TU Electric with regard to its demand-side management
program as well as other incentives sought by TU Electric for energy conservation; (3) the
reasonableness of costs and expenditures of TU Electric's demand-side management program; (4)
the effect of TU Electric's capacity, demand, and resource planning on the promotion of energy
conservation; (5) the effect of supply-side energy decisions or choices made by TU Electric on
the promotion of energy conservation and whether such choices or decisions were consistent with
least-cost planning; and (6) the reasonableness and necessity of costs sought to be recovered by
TU Electric from its ratepayers in pursuit of additional supply-side energy choices.
5. In its motion to intervene, TLSC expressed its desire to address two issues: (1) the cost
effectiveness of TU Electric's demand-side management programs and (2) the availability of
utility-financed conservation for low-income households.
6. The PFD included 230 findings of fact and 45 conclusions of law.
7. Appellants alleged that Texas ROSE had incurred attorneys' fees and expert witness fees
of approximately $200,000, and that TLSC had expended legal time valued at $50,000 and had
incurred expert witness fees of approximately $29,000.
8. In 1992, section 2621 of PURPA was amended to add four new ratemaking standards. 
See 16 U.S.C.A. § 2621(d)(7)-(10) (West Supp. 1999) ("1992 standards
"). These standards
address integrated resource planning, investments in conservation and demand management,
energy efficiency investments in power generation and supply, the effects of wholesale power
purchases on utility cost of capital, the effects of leveraged capital structures on the reliability of
wholesale power sellers, and assurance of adequate fuel supplies. See id.
9. Subchapter II of Chapter 46--Public Utility Regulatory Policies, entitled "Standards for
Electric Utilities," is comprised of PURPA sections 2621 through 2627. Section 2621(d) and
2623(b) are the only sections therein that establish ratemaking standards.
10. See PURPA § 2602(19) (West Supp. 1999) ("The term 'integrated resource planning'
means, in the case of an electric utility, a planning and selection process for new energy resources
that evaluates the full range of alternatives, including new generating capacity, power purchases,
energy conservation and efficiency, cogeneration and district heating and cooling applications, and
renewable energy resources, in order to provide adequate and reliable service to its electric
customers at the lowest system cost.").
11. Because of the conclusion reached he